2013 VT 82

## Judith Meyncke v. Robert Meyncke

[82 A.3d 585]

No. 12-475

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed September 13, 2013

---

*Charles S. Martin* and *Lisa Marie Campion* (On the Brief) of *Martin & Associates, P.C.*, Barre, for Plaintiff-Appellant/Cross-Appellee.

*Thomas C. Nuovo* of *Bauer Gravel Farnham*, Burlington, for Defendant-Appellee/Cross-Appellant.

¶ 1. **Reiber, C.J.** Ex-husband and ex-wife[1] each appeal a post-judgment order of the superior court, family division, awarding wife maintenance arrears and attorney's fees, and construing a provision in the final divorce order distributing the parties' retirement accounts, including husband's 401(k) account,[2] which decreased in value substantially before it could be divided because of delay in issuance of a qualified domestic relations order (QDRO). We affirm in part and remand for further proceedings consistent with this opinion.

¶ 2. The parties divorced in October 2007 following a twenty-four-year marriage. The final divorce order divided evenly the marital property, including the parties' retirement accounts, and awarded wife $6390 per month in maintenance for thirteen years. The divorce court required husband to prepare a proposed order to minimize the transfer of accounts and equalize the amounts

---

[1] For the sake of simplicity, we will hereafter refer to the parties as husband and wife.

[2] The final divorce order refers to tax-deferred accounts, IRAs, and 401(k) accounts. In other proceedings involving the parties, the court referred to pensions and investment accounts. The one account that is central to this case because of its size and precipitous drop in value is husband's primary 401(k) account. Again, for the sake of simplicity and clarity, we use the general term "retirement accounts" in this opinion.

held by the parties. Husband did not prepare a proposed QDRO before wife filed a motion to alter or amend the final divorce order. In January 2008, wife filed a proposed QDRO, to which husband objected in part, but the QDRO never issued because wife filed a notice of appeal after the court denied her motion to alter or amend the final order.

¶ 3. In January 2009, wife withdrew her appeal of the final divorce order. During the period between issuance of the final order in October 2007 and dismissal of wife's appeal in January 2009, the retirement accounts, particularly husband's 401(k) account, depreciated significantly in value.

¶ 4. Meanwhile, the parties continued to litigate over maintenance payments. Husband lost his job in late 2007 and was not reemployed until April 2008. In May 2008, he moved to modify the maintenance award. The court denied the motion in October 2008 and found husband in contempt for failure to pay his full maintenance obligation to wife. When husband failed to purge himself of the contempt, the court issued a wage-withholding order. In August 2009, this Court affirmed the trial court's denial of husband's motion to modify maintenance. *Meyncke v. Meyncke,* 2009 VT 84, 186 Vt. 571, 980 A.2d 799 (mem.).

¶ 5. Wife's second motion for contempt and enforcement was granted in April 2010. On August 30, 2010, after a series of post-judgment motions, the court issued an amended judgment order prepared by wife's attorney that required husband to pay wife $106,607 within thirty days to purge himself of contempt and $17,355 in attorney's fees. To collect on the Vermont judgment, wife engaged an attorney in Missouri, husband's last known residence, and registered the judgment there in May 2011.

¶ 6. In May 2012, wife filed a motion with the superior court to enforce the final divorce order as well as the August 2010 judgment. The motion requested that husband be required to file a QDRO giving her one-half of the retirement accounts as valued in the final divorce order. The motion also sought payment of all maintenance arrearages, interest, and attorney's fees owed. Both parties requested an offset against child support owed by wife.

¶ 7. In July 2012, husband paid wife $138,729 pursuant to documents titled "Satisfaction of Judgment" and "Settlement Agreement and Specific Release." In the former document, filed with a Missouri circuit court, wife stipulated that the sum paid by husband was for past maintenance owed and "satisfied in full" the

"judgment herein." In the latter document, wife acknowledged that the August 30, 2010 Vermont order was "resolved and settled," and that husband was completely released and discharged "from any and all liabilities directly or indirectly arising out of the Vermont Superior Court's Order dated August 30, 2010."

¶ 8. On October 30, 2012, the superior court decided wife's May 2012 motion to enforce based solely on the pleadings and applicable law. Regarding valuation of the retirement accounts, the court ordered husband to prepare a QDRO dividing the accounts equally subject to any appreciation or depreciation between the date of the final divorce order and the date of distribution. The court reasoned that such a ruling was consistent with the final divorce and was equitable considering that the delay in issuing the QDRO was more attributable to wife than husband. The court opined that even if the delay occurred through no fault of either party, equity favored having the parties share in any loss resulting from the delay.

¶ 9. As for maintenance, the court concluded that the July 2012 settlement agreement applied only to amounts owed up to the August 2010 judgment, and that from August 2010 until the date of its decision, husband owed wife $16,563 in maintenance arrears and interest after he was credited for certain specified past payments. The court also awarded wife $5000 in attorney's fees. The court made no ruling on the request for an offset between the parties' child support and maintenance arrears.

¶ 10. On appeal, wife argues that the superior court erred by: (1) not requiring a QDRO awarding her one-half of the value of husband's retirement accounts as calculated by the court at the time of the final divorce order; (2) allowing husband to determine the current value of the accounts rather than holding an evidentiary hearing; (3) applying certain prior payments made by husband to wife against current maintenance arrears rather than against interest on maintenance arrears from the August 2010 judgment; and (4) allowing an $1893 prior payment from husband to wife as a credit against maintenance arrears. Wife also argues that the court abused its discretion by failing to rule on whether her child support arrears may be offset against husband's maintenance arrears.

¶ 11. For his part, husband argues that the court erred by awarding wife additional maintenance arrears and attorney's fees even though: (1) he had paid all maintenance and attorney's fees

owed under the final divorce order; (2) the July 2012 settlement agreement effectively vacated the August 30, 2010 judgment, in which the amount of maintenance owed had been incorrectly calculated due to a mathematical error contained therein; and (3) the parties stipulated in their settlement agreement that they would each bear their own legal fees. According to husband, the court's failure to rule on and grant his motion under Vermont Rule of Civil Procedure 60(a) to correct the August 30, 2010 judgment resulted in the court erroneously determining that he owed wife maintenance in excess of his obligation under the October 2007 final divorce order.

## I.

¶ 12. ▮ We begin with the question of how the retirement accounts, and specifically husband's 401(k) account, should be divided after their diminution in value. Wife contends that under "the four corners" of the final divorce order she is entitled to a QDRO for a sum calculated as one-half of the retirement accounts as valued by the court at the time of the October 2007 final divorce order. See *Sumner v. Sumner*, 2004 VT 45, ¶ 9, 176 Vt. 452, 852 A.2d 611 (stating that divorce decrees are interpreted according to contract principles). As support for this argument, wife points out that the court in the final divorce order: (1) noted that the total value of the retirement accounts was $911,420 on the day evidence in the divorce case was closed; (2) determined that those accounts were to be divided "evenly"; and (3) noted, in discussing the appropriate amount of maintenance, that both parties "will start with about $443,000 in retirement or other tax deferred savings." In wife's view, these statements unambiguously demonstrate the court's intent to award wife a QDRO in an amount equal to one-half of the retirement accounts as valued in the final divorce order.

¶ 13. In further support of this contention, at oral argument before this Court, wife quoted from a transcript of the final divorce hearing a dialog between the divorce court and the parties' attorneys concerning the valuation of the retirement accounts. In that dialog, the parties' attorneys were discussing valuation dates of various accounts, when the court asked them if they wanted to divide the accounts "as of today's date regardless of future experience." Wife's attorney initially expressed some confusion as to what the court meant, but ultimately agreed to

what the court was describing. Husband himself agreed that the risk was his, noting that the only account that concerned him was a relatively small one that he was not sure he could change. Wife argues that this dialog is not only evidence of the court's intent in its final order, but also of husband's waiver of any argument that it was not the court's intent.

¶ 14. Husband has moved to strike the divorce transcript and wife's reliance upon it, noting that it was not part of the record in the enforcement proceeding that is the subject of this appeal. Wife counters that the final divorce hearing and the post-divorce hearing on her motion to enforce are both part of the same proceedings, and that the transcript of the divorce hearing is part of the record of those proceedings.

¶ 15. ▉ ▉ Putting aside whether we may review the transcript as part of the overall divorce proceedings, we note that wife cited the transcript in support of her valuation argument for the first time during oral argument before this Court. Wife did not submit the transcript to the superior court for its review in connection with her motion to enforce. Nor did she cite to the transcript in her principal brief or reply brief on appeal. Because wife did not give the superior court an opportunity to consider the dialog and further did not argue that husband had waived any opposition to her contention that she was entitled to a QDRO for a sum certain calculated as one-half of the retirement accounts as valued in the final divorce order, we need not consider her waiver argument. See *Osmanagic v. Osmanagic*, 2005 VT 37, ¶ 10, 178 Vt. 538, 872 A.2d 897 (mem.) (stating that issues not briefed at trial court and raised for first time on appeal will not be considered); *Hoover v. Hoover*, 171 Vt. 256, 258 n.3, 764 A.2d 1192, 1193 n.3 (2000) (refusing to consider evidence not presented at trial).

¶ 16. Nor does the dialog cited by wife from the divorce hearing conclusively demonstrate the divorce court's intent as to how to deal with any appreciation or depreciation in the parties' retirement accounts before a QDRO issued. Indeed, the court's purpose in initiating the dialog was to ask the parties what they wanted to do. The clearest evidence of the parties' expectations is the QDRO proposed by wife's attorney in January 2008 relatively soon after the final divorce order issued. The QDRO contained a clause stating that wife would be paid fifty percent of the balance of husband's accounts "as of October 8, 2007, plus investment gains

and losses on such amount from such date until the date such amount is distributed" to wife. See *Shorter v. Shorter*, 851 N.E.2d 378, 386 (Ind. Ct. App. 2006) (stating that draft QDRO provision requiring administrator to apply gains and losses pro rata when dividing retirement account evinced parties' intent to share in any fluctuations in account during interim period between final divorce order and division of accounts through QDRO). Husband did not oppose this provision, which presumed that the parties would share in any gains or losses until distribution of the retirement account funds.

¶ 17. This is consistent with the terms of the final divorce order itself, which did not establish a valuation date. See *Blaine v. Blaine*, 744 N.W.2d 444, 449 (Neb. 2008) ("It is well settled that once a decree for dissolution becomes final, its meaning is determined as a matter of law from the four corners of the decree itself."). In that order, the court stated that the "principle" governing its distribution of marital property following the parties' long-term marriage is that they "should divide their assets evenly between them." Specifically, with respect to the retirement accounts, the court stated that those "accounts shall be divided evenly." The fact that the court listed the total amount held in those accounts in its findings and then later estimated what each party would receive from an equal distribution of the accounts based on their then-current value says nothing about whether the parties should share in any appreciation or depreciation in the value of the accounts between the final order and issuance of a QDRO. See *Austin v. Austin*, 2000 ME 61, ¶ 6, 748 A.2d 996 ("Although the divorce court recited the balance in the [401(k)] account as of the date of the hearing, the award was not one-half of that balance but one-half of the account.").

¶ 18. The bottom line is that the divorce court awarded wife fifty percent of the retirement accounts, not a sum certain based on the then-value of the accounts. Compare *Buchanan v. Buchanan*, 936 So. 2d 1084, 1087 (Ala. Civ. App. 2005) (concluding that where final divorce order gave wife fifty percent of retirement accounts and each party was equally responsible for delay in issuing QDRO, trial court erred by assigning husband entire loss from decline in value of 401(k) following final order and before QDRO issued), with *Romer v. Romer*, 44 So. 3d 514, 522 (Ala. Civ. App. 2009) (distinguishing *Buchanan* and concluding that where final divorce order, which was based on parties' settlement agree-

ment, awarded wife sum certain of husband's retirement account, "the parties implicitly determined that the husband alone would bear the risk of any decrease in the value of his account or benefit from any increase in the value of his account").

¶ 19. ▪ ▪ At best from wife's perspective, the divorce order is simply silent, and therefore ambiguous, as to whether the court intended both parties to share in any depreciation or appreciation of the accounts before a QDRO issued. See *Towslee v. Callanan*, 2011 VT 106, ¶ 5, 190 Vt. 622, 55 A.3d 240 (mem.) (stating that if provision in divorce order is ambiguous, trial court must look not only at language of order itself, but also evidence concerning its subject matter, purpose at time of execution, and situations of parties to determine meaning of provision as question of fact); see also *Case v. Case*, 794 N.E.2d 514, 519 (Ind. Ct. App. 2003) (holding "that absent express language stating otherwise, the decree implicitly contemplated that both parties would share in the risks and rewards associated with the investment plan"). As noted, wife's proposed QDRO indicates that at least wife expected to share in any appreciation or depreciation occurring in the accounts before dividing them through a QDRO. We find no error in the superior court construing the final divorce order to require the parties to share in any depreciation or appreciation of the retirement accounts resulting from the delay in issuing a QDRO, given that neither party was disproportionately responsible for undue delay.

¶ 20. Wife argues, however, that the court erred in determining that the parties had to share in the depreciation of the retirement accounts, considering that husband was the party in control of the accounts and was the one that the court assigned to draft a QDRO to divide them. In essence, she argues that she should not suffer the consequences of the · diminution of the retirement accounts because husband was disproportionately responsible for undue delay in this case. Along the same lines, wife states that husband should not benefit from an equitable remedy because he comes to the court with unclean hands, as evidenced by the earlier findings of contempt for failure to pay maintenance. At minimum, according to wife, the court should have held a hearing and taken evidence on which party was at fault for the delay in issuing a QDRO.

¶ 21. As an initial matter, the superior court did not err in deciding wife's motion to enforce without holding a hearing. Wife

has not indicated that she requested a hearing, and her May 2012 motion to enforce does not include a request for a hearing. See V.R.C.P. 78(b)(2) ("An opportunity to present evidence shall be provided, if requested, unless the court finds there to be no genuine issue as to any material fact. The request for an opportunity to present evidence shall include a statement of the evidence which the party wishes to offer."); V.R.F.P. 4(a)(1) (stating that Vermont Rules of Civil Procedure are applicable in divorce proceedings except as otherwise provided in rule). In any event, the parties do not disagree on the facts regarding what transpired to delay issuance of the QDRO; rather, they disagree only on who is to blame for the delay, given those facts. The court did not need to hold an evidentiary hearing to make that determination. See V.R.C.P. 78(b)(2) ("In any case, the court may decline to hear oral argument and may dispose of the motion without argument.").

¶ 22. The undisputed record shows that in its October 26, 2007 final order the divorce court ordered husband to prepare a proposed order minimizing the number of transfers of accounts and equalizing the accounts held by both sides. The court explained that the principal adjustment would be made to husband's large 401(k) account. On November 9, 2007, at which point husband had not yet prepared a proposed QDRO, wife filed a motion to alter or amend the court's final divorce order. On December 28, 2007, while wife's motion was pending, the court ordered the parties' attorneys to meet the following week "to draw up a proposed order to divide the 401(k) plan and to divide other investment accounts equally as previously ordered."

¶ 23. The parties did not meet that following week, but on January 15, 2008, wife filed a proposed QDRO that included the provision quoted above indicating that the parties would share any gain or loss resulting from appreciation or depreciation of the retirement accounts before they were divided. Husband accepted wife's proposed QDRO in all respects except that he sought the inclusion of language that accounted for a loan he had taken from the 401(k) account. He contended that the debt stemming from that loan had to be divided evenly as set forth in the final divorce order. A hearing was set for March 11, 2008 to consider husband's request to amend wife's proposed QDRO, but that hearing was not held because on February 22, 2008 wife appealed the court's January 25, 2008 ruling denying her motion to alter or amend,

and the court held that, as the result of the automatic stay pending that appeal, it lacked jurisdiction to issue a QDRO. Neither party sought to lift the automatic stay specifically to allow for issuance of a QDRO, although husband was successful in getting the stay lifted so that he could obtain proceeds from the sale of the marital home. By the time wife withdrew her appeal in January 2009, husband's 401(k) had declined substantially in value.

¶ 24. Considering these facts, as found by the superior court, the record supported the court's conclusions that delay in issuance of a QDRO was more the result of wife's actions than husband's, and that requiring the parties to share in the loss caused by the delay was both consistent with the final divorce order and equitable under the circumstances. See *Towslee*, 2011 VT 106, ¶ 5 ("We defer to the court's factual findings so long as not clearly erroneous, meaning that we will affirm if they are supported by the evidence as seen in the light most favorable to the prevailing party."). Although the 401(k) account belonged to husband and the court initially ordered husband's attorney to file a proposed order dividing the retirement accounts, the court later ordered the parties to work together to draft a proposed QDRO. Thus, the court shifted responsibility for preparing the QDRO from husband to both husband and wife. Wife wound up filing a proposed QDRO that presumed the parties would share in any loss or gain until the 401(k) was divided by the QDRO. Husband filed no objection to that provision, but rather objected to only a minor part of the QDRO. That issue was never resolved, however, because of wife's appeal from the court's denial of her motion to alter or amend. Wife certainly had a right to file her motion to alter and amend and to appeal the denial of that motion, but those actions unquestionably delayed issuance of the QDRO. To varying degrees, the actions or inactions of both parties resulted in the QDRO not being issued timely with their divorce. In any event, the record suggests that the parties assumed, at least initially, that they would share in any intervening gains or losses. Moreover, this assumption was consistent with the intent of the divorce court to divide the retirement accounts evenly.[3]

[3] As for wife's brief argument that husband cannot benefit from the superior court's equitable decision because he has "unclean hands," the prior contempt orders did not concern the valuation of the parties' retirement accounts, and the

¶ 25. ■ Although we have no case law directly addressing the precise issue before us, we have stated generally "that as part of the broad discretion the family court has in distributing marital property, the court generally has the discretion to account for changes in value of assets between the time that the court orders their distribution and the distribution actually occurs." *Leas v. Leas*, 169 Vt. 364, 370-71, 737 A.2d 889, 894 (1999) (citation omitted) (noting that investment accounts, by their nature, "are subject to swings in value, up or down, and no unfairness occurs in singling out these assets for distribution of post-judgment appreciation or depreciation"). *Id.* at 371, 737 A.2d at 894. Our decision in this case is also generally consistent with decisions by courts in other jurisdictions dealing with depreciation in valuation of retirement accounts pending issuance of a QDRO. See, e.g., *Buchanan*, 936 So. 2d at 1087 (stating consensus among courts that when final divorce order awards spouse percentage share rather than sum certain of variable asset and is silent as to market fluctuations between final order and distribution of asset, and when both spouses are responsible for delay in distribution of assets, both spouses must share in any subsequent gains or losses caused by delay); *Taylor v. Taylor*, 2002 WI App 253, ¶ 1, 653 N.W.2d 524 (concluding that parties who were awarded percentage of 401(k) account under settlement agreement had to share market losses in account).

¶ 26. In a related argument, wife contends that the court erred by ordering that the retirement accounts be divided equally "subject to any appreciation or depreciation in such accounts between the date of [the final divorce order] and the date of distribution." According to wife, the court should have stayed its order pending discovery and an evidentiary hearing to determine the exact amount owed rather than let husband decide how much wife is to receive from the QDRO. The court ordered husband "to prepare the QDRO consistent with this decision and for approval by the court," but at the end of its decision also ordered "the parties" to submit a QDRO for approval consistent with the court's decision." Because the QDRO concerns multiple retirement accounts and there is no evidence in the record indicating that wife has been provided with updated information in the recent

court's decision regarding this issue was based as much on its interpretation of the final divorce order as on the equities of the situation.

past involving those accounts, the court should allow discovery, and an evidentiary hearing if necessary, concerning the current value of the accounts before the parties submit a QDRO for the court's approval. Nonetheless, given the parties' litigious history and the past significant delays in this case, the parties would benefit from the court setting firm deadlines on moving forward toward issuance of a QDRO consistent with the court's analysis, which we uphold here.

## II.

¶ 27. The parties each raise several arguments concerning maintenance. Before considering those arguments, we briefly summarize the maintenance history in this case. The October 2007 final divorce decree awarded wife $6390 in monthly maintenance beginning in November 2007 and subject to an annual two percent cost-of-living adjustment (COLA) every subsequent November for the duration of the maintenance period. From the outset, husband was in arrears in meeting his maintenance obligation, and in August 2010, an amended judgment was entered in the amount of $106,607 for maintenance owed and $17,355 for attorney's fees. Both sums carried interest at a rate of twelve percent per annum. Husband paid wife sums of $14,926 and $407 in November 2011 and February 2012, respectively, purportedly to make up the difference between his monthly maintenance obligation and the monthly wage withholding payments made to her.

¶ 28. In July 2012, the parties entered into a settlement agreement in which wife agreed that husband had paid her $138,729 in full satisfaction of the August 2010 judgment. The settlement agreement released and discharged husband "from any and all liabilities directly or indirectly arising out of" the August 2010 judgment. Earlier, in May 2012, wife had filed a motion to enforce the August 2010 judgment and obtain additional arrears that she claimed had accumulated since that judgment.

¶ 29. In its October 2012 order, the superior court concluded that husband owed an additional $28,208 in maintenance arrears since the August 2010 judgment, plus $5581 in interest on that sum, but that he was entitled to credits for the $14,926 and $407 payments as well as $1893 for a June 2011 wage adjustment by one of his employers, resulting in a total of $16,563 owed to wife. The court also awarded wife $5000 in attorney's fees.

¶ 30. On appeal, wife argues that the superior court erred by giving husband credit against his current maintenance obligation

for the presettlement $14,926 and $407 payments he made to her. According to wife, she applied those payments against interest owed on the August 2010 judgment. She also argues that the evidence does not support the court's decision to credit husband for the $1893 amount he claimed.

¶ 31. For his part, husband argues that he has not been in arrears in maintenance payments since the August 2010 judgment, which was fully satisfied under the parties July 2012 settlement agreement. He contends that the maintenance arrearage calculated by the superior court stems from a mathematical error in the August 2010 judgment that he assumed was resolved as part of the settlement agreement effectively dissolving that judgment. He further argues that, even if the parties did not intend to correct the error in their July 2012 settlement agreement, the court failed to address his request that the court correct the "clerical" mistake under Rule 60(a). In short, husband argues that the court should not have awarded wife any maintenance arrears or any attorney's fees with respect to her May 2012 motion to enforce.

¶ 32. Unfortunately, our review of the voluminous record in this case does not clarify the issues so as to preclude a remand for the superior court to reconsider its maintenance arrearage award. We start with the more fundamental issues raised by husband. The gist of husband's principal argument appears to be that he does not owe wife any maintenance arrears because of the parties' settlement agreement and his having satisfied all of his monthly obligations since then. To the extent that husband is arguing that the July 2012 settlement agreement resolved all maintenance arrears up until the date of the settlement, we agree with the superior court that the argument has no merit. Husband's payment of $138,729 was made explicitly in satisfaction of the August 30, 2010 judgment. The settlement "resolved and settled" wife's claims solely with respect to that judgment. Wife's acknowledgement was limited to "full and complete payment of all sums due for past maintenance owed to [wife] by [husband] *arising under said [August 2010]* Order." (Emphasis added.) The settlement agreement discharged husband "from any and all liabilities directly or indirectly arising out of" the August 2010 judgment, but any maintenance arrears that husband incurred between the time of that judgment and the July 2012 settlement did not directly or indirectly arise out of the judgment. The

August 2010 judgment did not order husband to pay a specific amount of maintenance in the future; rather, it simply determined that husband owed a specified amount in maintenance arrears and attorney's fees up until the date of that judgment.

¶ 33. Moreover, we find no support in the record for husband's argument that by discharging him from any liabilities arising directly or indirectly from the August 2010 judgment, wife implicitly agreed to resolve a mathematical error contained in that judgment so as to reduce his maintenance obligation going forward. The alleged mathematical error arose as follows. The superior court issued a judgment in July 2010 for approximately $75,000 in maintenance arrears and attorney's fees. First husband and then wife filed motions asking the court to amend the judgment under Rule 60(a). In relevant part, wife argued that the court inadvertently failed to add the annual two percent COLA to husband's monthly maintenance obligation. Her affidavit indicated that a COLA needed to be added beginning in November 2007 — one month after the final order. Apparently as the result of wife's motion, the court increased the judgment for maintenance arrears to $106,607.

¶ 34. Before the superior court in the instant proceeding, husband argued that in the August 2010 judgment the court made a "clerical" error by adding the two percent annual COLA beginning with the initial maintenance payment in November 2007 rather than in November 2008 as required by the October 2007 final divorce order. Husband asked the court to correct the clerical error under Rule 60(a), which he apparently presumed would automatically reduce the monthly amount owed from August 2010 onward. Wife acknowledged before the superior court that her attorney "incorrectly began the COLA adjustment of 2% per annum at the inception of the payment of spousal maintenance rather than at the first anniversary of the beginning of [husband's] obligation." Nevertheless, the court did not address either husband's Rule 60(a) argument or the question of whether a mathematical error contained in the August 2010 judgment had been perpetuated in payments made since that judgment.

¶ 35. ▪ We cannot tell from the record, including the parties' briefs and the court's decision, whether the court's determination of the amount husband owed in maintenance arrears since the August 2010 judgment was based on perpetuation of the alleged

erroneous calculation contained in the August 2010 judgment. Accordingly, the case must be remanded for the court to address husband's argument that his maintenance payments since August 2010 exceeded what was required under the final divorce order as the result of a miscalculation in the August 2010 judgment. We reiterate that the parties' July 2012 settlement agreement did not acknowledge either that the parties had resolved such an error so as to affect their determination of what husband owed in maintenance after August 2010, or that any such error even existed. Indeed, it is not clear from the record when the alleged error was discovered.

¶ 36. Nor do we see what relief could be provided under Rule 60(a). In setting forth what husband owed in maintenance arrears in the August 2010 judgment, the court apparently relied upon wife's calculation from her Rule 60(a) motion. Wife's affidavit submitted with that motion plainly indicated additional sums to be added to husband's obligation beginning in November 2007 due to the COLA adjustment. Husband did not object on that point and eventually paid wife a specified sum to satisfy the August 2010 judgment. Having been satisfied, the judgment is no longer effective. In any event, as noted, the judgment dealt with arrears only and did not specify any future maintenance obligation beyond that set forth in the final divorce order.

¶ 37. Notwithstanding the inapplicability of Rule 60(a), however, we believe that any past mistake in the calculation of maintenance caused by the court erroneously adding the two percent COLA adjustment beginning in November 2007 rather than November 2008 should be corrected in determining husband's obligation going forward from August 2010. The final divorce order awarded wife $6390 in monthly maintenance for a set period of thirteen years, with a two percent COLA added to the monthly obligation for each year beginning in November 2008. One could argue that, going forward from the August 2010 judgment, the two percent COLA should be added to the preexisting monthly base amount even if that base amount is incorrect. Such an approach, however, would not only be inequitable but would be inconsistent with the court's intent in the final divorce order to award wife a specific calculable amount to be paid in 156 monthly increments over thirteen years.

¶ 38. We recognize that, if indeed there was a mistake in the August 2010 arrearage judgment as described by husband, hus-

band will have paid more maintenance through August 2010 than anticipated in the final divorce order due to the parties' July 2012 settlement of the dispute arising from the August 2010 arrearage judgment. The 2010 arrearage judgment did not purport to establish husband's *prospective* maintenance obligation, however, and the 2007 final divorce order remains the operative judgment with respect to his obligation after August 2010. There is no reason, then, why husband should be responsible for paying increased maintenance subsequent to the August 2010 judgment based on a mistaken calculation setting the amount of that arrearage judgment.

¶ 39. Accordingly, we remand the matter for the superior court to reassess its determination of husband's maintenance arrears since August 2010 in light of his argument that wife's calculations misapply the COLA in the final divorce order. The court must recalculate husband's maintenance arrears, if any, by determining his monthly obligation since the August 2010 judgment under the terms of the October 2007 final divorce order. That will require the court to start with the original $6390 monthly maintenance amount and add a two percent COLA for each year beginning in November 2008 to arrive at the correct monthly obligation for the months following the August 2010 judgment. The court can then calculate any current arrearage based on that information.

¶ 40. Also regarding maintenance, wife argues that the superior court erred in reducing its calculation of husband's maintenance arrears by the sum of two payments husband made to wife, a $14,926 payment made in November 2011 and a $407 payment made in February 2012. Wife claims that she applied those sums to interest he owed on the then-unpaid August 2010 judgment. Husband responds that those payments made up the difference between the amount wife received through wage-withholding and his monthly maintenance obligation. He asserts that he intended the payments to keep him current with his monthly maintenance obligation. The court declined to penalize husband for trying to keep his maintenance payments current, noting that wife had failed to cite any authority for the proposition that she was entitled to apply the payments to interest from a prior judgment on maintenance arrears.

¶ 41. There was no evidentiary hearing in this case, and the record does not reveal any evidence as to husband's intent in making the payments. The superior court apparently found cred-

ible husband's contention that the payments were part of his current maintenance obligation and unconnected to payment of the August 2010 judgment. Wife's reliance on 9 V.S.A. § 41a(d) is misplaced in that it concerns payments on a debt, and here the trial court appears to have accepted husband's claim that the payments were essentially current maintenance payments. On remand, the court may take evidence on this issue and reconsider its prior decision based on that evidence.

¶ 42. Wife also argues that the superior court erroneously credited husband for a $1893 payment that husband attributes to an adjustment to wage withholding in June 2011. According to wife, the court erred by accepting husband's unsworn and unsigned statement rather than her signed and notarized statement indicating that she did not receive this specific payment claimed by husband. Husband does not respond to this argument other than stating that he removed the $1893 payment from the chart provided to the superior court and this Court because even without the $1893 payment he has made payments to wife that exceeded his maintenance obligation. The court should revisit its decision on remand after receiving additional evidence.

III.

¶ 43. In addition to his maintenance arguments, husband also argues that the superior court erred by granting wife $5000 in attorney's fees in connection with her motion to enforce. He contends that wife was not entitled to attorney's fees because of the provision in the July 2012 settlement agreement stating as follows: "The parties to this Agreement shall bear their own attorney's fees and cost for this proceeding."

¶ 44. Husband does not challenge any of the superior court's findings with respect to attorney's fees, including that: (1) wife was seeking $40,525 in attorney's fees; (2) two-thirds of that sum represented a twenty percent fee to collect the August 2010 judgment, which involved hiring a Missouri attorney to register the Vermont judgment in Missouri, where husband was living; and (3) wife incurred the remaining $12,779 in fees in connection with the May 2012 motion to enforce, which, among other things, sought a judgment for the additional $30,000 in maintenance arrears that she claimed had accrued since the August 2010 judgment. The court elected to award wife $5000 in attorney's fees, weighing husband's repeated pattern of nonpayment against

wife's limited recovery on the issues she raised in her motion to enforce.

¶ 45. ▓▓▓ We reject husband's argument that the July 2012 provision regarding attorney's fees precluded the court from awarding attorney's fees in this case. The provision was plainly limited to the collection action that led to the settlement agreement satisfying the August 2010 judgment. It foreclosed a claim for fees in connection with *that* matter only and did not preclude an award of fees in connection with future enforcement motions. Nevertheless, given the court's reliance in part on the extent to which wife prevailed on her May 2012 motion to enforce, which may change on remand, the court may revisit the issue of attorney's fees on remand.

## IV.

¶ 46. ▓▓ ▓▓ Finally, wife argues that the superior court abused its discretion by not ruling on her request to offset her child support arrears against husband's maintenances arrears. Husband does not oppose an offset and in fact notes in his brief that wife has refused his request for an offset. Given that wife owes the child support to husband rather than the state and that the parties' child has reached the age of majority, we see no reason for the superior court on remand not to make an equitable offset once it determines how much, if any, maintenance arrears are owed by husband. See *Schumann v. Schumann*, 2010-Ohio-5472, ¶ 47, 944 N.E.2d 705 (Ct. App.) ("The decision to permit a setoff of judgments is within the trial court's discretion.").

¶ 47. To sum up, with respect to the retirement accounts, we affirm the superior court's order that in this case husband and wife shall share equally the post-divorce depreciation in the value of the retirement accounts for purposes of calculating a QDRO. We conclude, however, that the parties should have an opportunity for discovery before entry of a final QDRO consistent with the trial court's analysis. We reject husband's arguments that the July 2012 settlement and payment had an impact on any of his post-August 2010 obligations, including husband's obligation to pay spousal maintenance and including husband's potential liability for attorney's fees in connection with wife's enforcement efforts regarding post-August 2010 obligations. Finally, we remand for a hearing and calculation of husband's spousal maintenance arrear-

age to wife for the period subsequent to the August 2010 order considering the following: (1) husband's monthly spousal maintenance obligation throughout that period taking into account the COLA requirements of the October 2007 order, with the first annual COLA taking effect in November 2008; (2) whether husband's intent in making the November 2011 and February 2012 payments was to keep his ongoing spousal maintenance obligation current or, rather, was to pay down the interest and principal on the arrearages that were the subject of the August 2010 order; (3) whether husband paid, and wife received, the disputed June 2011 $1893 payment arising from husband's employer's wage withholding adjustment; and (4) any offset in husband's obligation due to wife's child-support arrearages owed to him.

*Affirmed in part and remanded for further proceedings consistent with this opinion.*