2015 VT 53











Dyke v. Scopetti (2014-232)

 

2015 VT 53

 

[Filed 03-Apr-2015]

 

NOTICE:  This opinion is subject to motions for
reargument under V.R.A.P. 40 as well as formal revision before publication in
the Vermont Reports.  Readers are requested to notify the Reporter of
Decisions by email at: JUD.Reporter@state.vt.us or by mail at: Vermont Supreme
Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order
that corrections may be made before this opinion goes to press.

 

 


 
 
 2015 VT 53
 
 


 


 
 
 No. 2014-232
 
 


 


 
 
 Kimberley Dyke
 
 
 Supreme Court
 
 
 
 
  
 
 
  
 
 
 
 
  
 
 
 On Appeal from
 
 
 
 
      v.
 
 
 Superior Court, Orange Unit,
 
 
 
 
  
 
 
 Family Division
 
 
 
 
  
 
 
  
 
 
 
 
 Frank Scopetti
 
 
 January Term, 2015
 
 
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
 
 
 Robert
 P. Gerety, Jr., J.
 
 
 
 
  
 
 


Todd C. Steadman of Davis Steadman & Ford LLC, White
River Junction, for Plaintiff-Appellee.

 

George E. Spaneas of Spaneas Law Office, Lebanon, New
Hampshire, for Defendant-Appellant.

 

 

PRESENT:    Reiber, C.J., Dooley, Skoglund and
Robinson, JJ., and Morris, Supr. J. (Ret.),

                    
Specially Assigned

 

 

¶ 1.            
ROBINSON, J.   This case involves a father’s obligation
to pay college tuition for his daughters pursuant to a Pennsylvania
child-support order.  Father appeals the trial-court order requiring him
to pay specified college-tuition costs for his two daughters.  We affirm.

¶ 2.            
The underlying facts are not in substantial dispute.  The parties,
father Frank A. Scopetti, Jr., and mother Kimberley Marie Scopetti, were
married in Pennsylvania and had two daughters.  They entered into a
separation agreement on July 30, 1998, when their elder daughter, Indie, was
six years old, and their younger daughter, Francesca, was five years old. 
The separation agreement is a two-page, handwritten document.  Paragraph 4
of the agreement provides: “Frank Scopetti agrees to provide college tuition
for Francesca and Indie [at] an institution acceptable to Frank Scopetti.”
 The separation agreement was incorporated into a final decree of divorce
issued in Pennsylvania on May 18, 2000.

¶ 3.            
Following the parties’ divorce, mother and the daughters moved to
Vermont, and father moved to Arizona.  On September 28, 2010, mother
registered the parties’ Pennsylvania support order in Vermont.[1]  That fall, Indie began studying at
George Mason University (GMU) in Virginia.  During the 2010-11 school
year, father paid only a portion of Indie’s tuition.

¶ 4.            
On August 19, 2011, mother filed a motion to enforce Paragraph 4 of the
separation agreement.  In response, father argued that he was not
obligated to pay any college tuition because the parties’ agreement was
illusory and unenforceable.  He further argued that even if the contract
was enforceable, his obligation to “provide college tuition” was excused by the
non-occurrence of the condition precedent: father’s “acceptance” of the choice
of institution.  Finally, he argued that $10,000 per year was a reasonable
amount under Paragraph 4, and that the sums he had already paid toward the
daughters’ college tuition represented an amount that was acceptable to him
because it was all he could afford.

¶ 5.            
In a December 2012 order, the magistrate granted mother’s motion to
enforce.  The magistrate concluded that “[i]t was clearly the intention of
the parties that [father] would be responsible for college tuition costs albeit
with some input as to the extent of his obligation provided by the requirement
of consultation and approval.”  The magistrate concluded that
“[n]oncompliance with a consultation condition . . . should
not eliminate the obligation completely, but should require that the obligor
parent assume some reasonable portion of the child’s educational
expenses.”  The magistrate noted that various courts have found that
“[w]hat is considered ‘reasonable’ . . . may vary depending
on a variety of circumstances,” including the costs of comparable colleges, the
parents’ ability to pay and station in life, the parents’ own education (and
their “collegiate expectations” for their children), and the child’s
educational needs.  The magistrate scheduled a further hearing to
determine what a “reasonable” contribution would be.

¶ 6.            
In April 2013, the magistrate held a hearing to determine what a
“reasonable” amount was for father to contribute for his daughters’ college
tuition.  The magistrate made the following findings.[2]  Both daughters did well in high
school and chose practical educations that would enable them to be employed
immediately upon graduation.  Indie chose nursing as a career and had the
goal of advanced degrees in that field.  She chose to attend GMU because
it was near a city and had a respected nursing program.  Father never told
Indie that he found GMU acceptable.  Indie did not apply to the nursing
program at the University of Vermont (UVM), where she would have paid the
in-state student rate (which was $12,888 in 2011-12, and $13,344 in
2012-13).  Nor did she want to attend college in Arizona.

¶ 7.            
For the 2010-11 school year (Indie’s freshman year), tuition was
$25,440, and her total cost of attendance was $38,233.  She received
scholarships and grants of $12,100 and a work-study grant of $2,250. 
Father paid $13,500 toward Indie’s tuition.  Indie took out loans to cover
the remaining costs.

¶ 8.            
For the 2011-12 school year (Indie’s sophomore year), GMU’s cost of attendance
was $43,193, with tuition accounting for $27,000 of that amount.  Indie
received $17,300 in scholarships and grants, and $2,000 in work-study. 
Father paid $15,201 toward GMU tuition, and Indie covered the balance with
loans.

¶ 9.            
Indie then transferred to the University of Maryland Baltimore School of
Nursing (UMSON) in the fall of 2012.  She did not get father’s approval
for the transfer.  Indie believed that UMSON offered a higher-status
clinical program and school ranking than GMU.  The cost of attendance at
UMSON for the 2012-13 school year was $57,087, with tuition accounting for
$27,012 of that amount.  While the UMSON tuition was comparable to GMU,
Indie’s actual costs were significantly higher because Indie forfeited the
scholarship and grant funds that she had received at GMU.  As a transfer
student, she was eligible only for a Pell Grant of $3,200.  Father paid
$5,000 toward her fall 2012 tuition, and at the time of the April 2013 hearing
had not made any payment for the spring term.  Indie took out $36,500 in
loans to cover the balance of the costs.

¶ 10.         In
the fall of 2011, Francesca enrolled in the four-year dental-hygiene
program at the University of New England (UNE) in Maine.  Although Vermont
Technical College (VTC) offers a two-year dental-hygiene program, no
institution in Vermont offers a baccalaureate dental-hygiene program, which
offers better career opportunities and higher earning potential than two-year
programs.  Northern Arizona University has a dental-hygiene program
comparable to UNE’s, but Francesca lived in Arizona for a short time and did
not like it there.  The cost of attendance at UNE for the 2011-12 and
2012-13 school years combined was $88,546.72, of which $60,180 was tuition.
 Francesca earned scholarships and grants of $46,400 over these first two
school years, and father paid $18,845.27 toward UNE tuition.  Francesca
took out loans to meet the difference.

¶ 11.         The
magistrate found that the daughters grew up in a “very modest living situation”
with a mother who worked two jobs, attended college classes at night, and
recently received an online degree qualifying her to be an administrative
assistant in health care.  Mother and the daughters lived in a mobile home
on rented land.

¶ 12.         Father
has degrees from Pennsylvania State University and the Indiana University of
Pennsylvania.  At the time of the parties’ divorce, father owned his own
business and earned around $200,000 annually.  For the past seven years,
father has been the senior vice president of a construction company in
Phoenix.  In 2011, his taxable wages, not counting his pre-tax
contributions for health and retirement benefits, were $331,913.  In 2012,
his gross (pre-deduction) wages were $403,326.  In 2013, father’s base
salary was $192,610; however, the magistrate found that he has typically earned
bonuses between $164,000 and $210,000 per year.  Father and his wife also
own a thoroughbred horse farm which operated at a loss of $35,000 in 2013 and
$40,000 in 2012.  Father’s monthly expenses of $14,000 include $1,500 per
month in veterinary and horse expenses and $1,400 per month for golf fees
related to entertaining clients.

¶ 13.         The
magistrate found that the parties contemplated the children going to college
and addressed the costs in their divorce agreement when the children were
young.  They did not mention a particular amount in their agreement.
 Father appears to have adopted his position that $10,000 per year per
daughter was the maximum amount that he was obligated to pay as the older
daughter began preparing for college.  The magistrate found that this
amount would not even cover the cost of in-state tuition for the daughters at
UVM.

¶ 14.         On
the basis of these findings, the magistrate concluded that father’s
determination that his obligation is limited to $10,000 is unreasonable in
light of the costs of tuition and father’s income and ability to pay.  The
magistrate explained that “Mr. Scopetti can withstand a loss of $40,000 in a
horse breeding business.  He chooses to pay more in veterinary bills than
he pays for either of his daughter’s educations.”  The magistrate thus
concluded that it was reasonable for father “to pay the tuition at the
children’s chosen colleges after all scholarships and grants have been applied
to the charges on the children’s accounts for tuition, fees, room and board,”
with “[a]ny other cost of attendance [being] the responsibility of the
children.”  The magistrate provided that any amount of grant or
scholarship that remained after non-tuition costs of attendance were satisfied
should be credited against father’s obligation for tuition.

¶ 15.         The
magistrate made an exception to this determination for Indie’s 2012-13 school
year.  The magistrate found Indie’s decision to transfer to UMSON, which
resulted in a significant loss of grant and scholarship funds, to be “an
unreasonable financial decision to make in light of the ongoing dispute over
the cost of tuition and the failure to involve her father in that
decision.”  Accordingly, the magistrate calculated father’s obligation for
the 2012-13 school year “as if Indie had continued to attend [GMU] using the
2011-12 costs for the 2012-13 school year,” reducing father’s financial 
obligation.  For the subsequent 2013-14 school year, however, the
magistrate ordered father to pay the full cost of tuition at UMSON.

¶ 16.         Father
appealed from the magistrate’s order to the superior court, arguing that there
was no contract because the parties had no “meeting of the minds” and Paragraph
4’s terms were illusory and thus unenforceable; that he had no obligation to
pay any tuition because of a failure of a condition precedent (his “acceptance
of the tuition costs”); that applying scholarships or grants received by the
daughters first to their non-tuition costs of attendance was error; that the
magistrate erroneously failed to apply Pennsylvania law to the parties’
agreement; and that the magistrate erred in applying a reasonableness analysis.

¶ 17.         The
superior court affirmed the magistrate’s judgment.  Applying Pennsylvania
law, the court concluded that the agreement was not indefinite or illusory,
because mutuality of obligation existed and because father’s “past payments for
his daughters’ tuition costs demonstrate[d] a clear intent to be bound” by the
contract.  Turning to the condition-precedent argument, the superior court
considered two decisions of the Superior Court of Pennsylvania (the intermediate
appellate court in that state) on the issue.  The Vermont superior court
concluded that the language in Paragraph 4 was most similar to language that
the Pennsylvania court concluded did not create a condition precedent.

¶ 18.         Having
determined that the contract was valid and father had an enforceable duty, the
court then construed the scope of that duty.  The court rejected father’s
argument that the magistrate “effectively rewr[o]te the parties’ agreement by
adding a term of ‘reasonableness’ ” and affirmed the magistrate’s
conclusion that father’s view of an “acceptable” tuition cost was unreasonable.
 With respect to father’s argument that any scholarships or grants should
first be applied to tuition before other expenses, so as to reduce the amount
father paid, the court concluded that “no requirement exists in the parties’
agreement or elsewhere that financial aid garnered by the daughters must be
primarily applied to lessen their father’s burden.”  Accordingly, the
court affirmed the magistrate’s prior orders.  Father substantially renews
his arguments on appeal to this Court.

¶ 19.         In
reviewing a child-support order on appeal, we consider legal issues de
novo.  Pahnke v. Pahnke, 2014 VT 2, ¶ 17, 195 Vt. 394, 88 A.3d
432.  We accept the magistrate’s findings of fact unless they are clearly
erroneous.  Id.

I.  Condition Precedent and Implied Reasonableness
Requirement

 

¶ 20.         Father
argues that the language “[at] an institution acceptable to Frank Scopetti” in
Paragraph 4 requires consultation and approval as a condition precedent to
father’s obligation to pay any tuition, and that the magistrate improperly
implied a “reasonableness” requirement with respect to father’s exercise of his
right of approval or disapproval.  Because these two arguments are
related, we consider them together.

¶ 21.         In
interpreting marital-settlement agreements, Pennsylvania courts apply the law
of contracts and seek to ascertain the intent of the parties.[3]  Kripp v. Kripp, 849 A.2d
1159, 1163 (Pa. 2004).  In accordance with Pennsylvania law, “[w]e must
give effect to every word and clause” of a legal instrument, “so as not to
render any provision nugatory or mere surplusage.”  In re Estate of
Smertz, 701 A.2d 268, 270 (Pa. Super. Ct. 1997).  We must “construe
the contract only as written and may not modify the plain meaning under the
guise of interpretation.”  Little v. Little, 657 A.2d 12, 15 (Pa.
Super. Ct. 1995) (quotation omitted).

¶ 22.         Pennsylvania’s
intermediate appellate court has thrice considered cases similar to this case.[4]  In Fina v. Fina, the
divorcing spouses’ settlement agreement provided that the father “agree[d] to
be responsible for twenty-five (25%) of the cost of the college tuition
. . . [for the daughter], if consulted concerning the choice of an
undergraduate school and provided he agrees thereto, which agreement shall not
be unreasonably withheld.”  1999 PA Super 201, ¶¶ 1, 737 A.2d
760.  In Fina, the trial court found that “other than general
discussions . . ., [the father] was excluded from [the
daughter’s] college selection process” and thus the requisite degree of
consultation had not occurred.  Id. ¶¶ 20-21.  The
appeals court affirmed, concluding that the college-tuition provision created
an obligation on the part of the mother and the daughter “to seek [the
father’s] consultation and agreement regarding . . . college
selection.”  Id. ¶ 21.  Because this obligation was not
met, the father’s obligation to pay 25% of the daughter’s college expenses
never arose.  Id.

¶ 23.         Subsequently,
in Wineburgh v. Wineburgh, the court considered a marital-settlement
agreement requiring the father to pay for the children’s college expenses but
providing that the father “will have a say in the choice of college” and that
he “will have the right to approve or disapprove a particular college but will
exercise that right in a reasonable fashion.”  2002 PA Super 415,
¶ 2, 816 A.2d 1105.  The court concluded that this provision did not
create a condition precedent that affirmatively required consultation with
father as a precondition to his obligation to pay.  Id. ¶ 10
(“We do not believe that having ‘a say’
equates with the requirement to ‘consult’ and, therefore, the language of the
[agreement] does not place an affirmative duty on Mother that would
precondition Father’s obligation to pay.”).

¶ 24.         In
its most recent case, Mazurek v. Russell, which was decided three weeks
after the trial-court decision in this case, the Pennsylvania court considered
an agreement that provided: “[I]t is the parties’ intention that the Children
attend such undergraduate institutions as are reasonable and appropriate for
the Children, with the parties’ mutual consent, which consent shall not be
unreasonably withheld.”  2014 PA Super 130, 96 A.3d 372, 379.  The
agreement provided that the father “shall pay one hundred percent (100%) of the
reasonable expenses associated with the Children attending such institutions.” 
Id.  The court found that the father’s obligation was to pay for
his son’s college at an institution mutually agreed to by the parents, and that
on the evidence presented, the father’s withholding of his consent for the
son’s chosen college was reasonable.  Id. at 381-82.

¶ 25.         We
draw two lessons from this review of pertinent Pennsylvania cases.  First,
the Pennsylvania courts have been reluctant to infer a “consultation”
requirement as a condition precedent to an obligor-parent’s obligation to pay
in the absence of express language.  In this case, the agreement provided
merely that father “agrees to provide college tuition for Francesca and Indie
[at] an institution acceptable to Frank Scopetti.”  Although the agreement
requires that the institution be acceptable to father—a factor we consider
below—it does not (in contrast to the agreement in Fina) specifically
mandate any advance consultation.  We conclude that any absence of
consultation with father before the daughters enrolled in college did not in
itself defeat father’s obligation under the agreement.

¶ 26.         Second,
Pennsylvania courts have readily enforced agreements conditioning the obligor’s
obligation to pay upon consent to or agreement with the child’s choice of
college in cases in which the obligor expressly agreed not to unreasonably
withhold such consent or agreement.  Mazurek, 96 A.3d at 379,
381-82; Fina, 1999 PA Super 201, ¶¶ 1, 21.  If the agreement
in this case includes such a requirement, the agreement is likely enforceable
under Pennsylvania law.[5]

¶ 27.         In
this case, we conclude that Paragraph 4’s “acceptable to [father]” language
creates an implied condition that such acceptance not be unreasonably
withheld.  In general, when an obligor’s duty is conditioned on
satisfaction with something—in this case, each child’s respective college
choice—“an interpretation is preferred under which the condition occurs if such
a reasonable person in the position of the obligor would be satisfied.” 
Restatement (Second) of Contracts § 228 (1981) [hereinafter
Restatement].  The Restatement acknowledges that “[i]f
the agreement leaves no doubt that it is only honest satisfaction that is meant
and no more, it will be so interpreted,” id. § 228 cmt. a, but makes it clear that “[w]hen . . . the
agreement does not make it clear that it requires merely honest satisfaction,
it will not usually be supposed that the obligee has assumed the risk of the
obligor’s unreasonable, even if honest, dissatisfaction.  In such a case,
to the extent that it is practicable to apply an objective test of reasonable
satisfaction, such a test will be applied.”  Id. § 228 cmt b.  The Restatement provides the following
illustration:

A contracts with B to install a heating system in B’s
factory, for a price of $20,000 to be paid “on condition of satisfactory
completion.”  A installs the heating system, but B states that he is not
satisfied with it and refuses to pay the $20,000.  B gives no reason
except that he does not approve of the heating system, and according to experts
in the field the system as installed is entirely satisfactory.  A has a
claim against B for $20,000 since it is practicable to apply an objective test
to the installation of the heating system.  This interpretation is also
preferred because it reduces A’s risk of forfeiture.

 

Id.
§ 228 ill. 3.

¶ 28.         The illustrated principle applies with equal force in this
context.  Accordingly, we conclude that under Pennsylvania law, the
condition that father is only required to pay for his daughters’ tuition if
they attend institutions acceptable to him is enforceable, but only insofar as
father exercises that discretion reasonably.  For this reason, we reject
father’s argument that the magistrate improperly implied a “reasonableness”
requirement into this agreement, and we conclude that the critical question in
this case is not whether father accepted the daughters’ choices, but rather
whether his refusal to accept them was reasonable under the circumstances.

II.  Unenforceability Due to
Indefinite Terms or Illusory Promises

 

¶ 29.         Our
conclusion that the agreement before us contains an implied condition that
father exercise his right to accept or reject daughters’ college choices in a
reasonable way resolves two other arguments raised by father on appeal. 
Father argues that the agreement is too vague and indefinite to enforce,
because it does not specify whether father is required to pay 100% of tuition
or address whether he is required to pay for graduate school or six years of
undergraduate tuition, and because the parties have different understandings as
to whether and under what circumstances father can refuse to accept a choice of
college.  In a related argument, father contends that because his
obligation to pay was conditioned on his acceptance of his daughters’
respective choices—a factor entirely within his control—the agreement was
illusory, and is unenforceable for that reason.

¶ 30.         The indefiniteness of the terms of an agreement is not
necessarily a basis for setting aside the agreement.  Greene v. Oliver
Realty, Inc., 526 A.2d 1192, 1201 (Pa. Super. Ct. 1987) (“Vague and
indefinite agreements are routinely enforced as long as courts are able to
supply ‘reasonable’ terms.”).  The lack of specific figures in the
contract does not render the agreement unenforceably indefinite, as father
argues. While the contract could have been made more clear, its terms did
provide “ ‘a reasonably certain basis’ for a court ‘to fashion an
appropriate remedy.’ ” In re Estate of Rosser, 2003 PA Super 132,
¶ 19, 821 A.2d 615 (quoting Dahar v. Grzandziel, 599 A.2d 217, 221
(Pa. Super. Ct. 1991)); see also Hathaway v. Hathaway, 98 S.W.3d 675,
681 (Tenn. Ct. App. 2002) (implying a “condition of reasonableness” in
agreement obligating parent to pay for college expenses).

¶ 31.         Similarly, a promise is illusory only when the promisor commits
himself or herself to nothing, so that “the promise is entirely optional with
the promisor.”  Rosser, 2003 PA Super 132, ¶ 18 (quotation
omitted).  The agreement here was not illusory.  As set forth above,
father’s ability to avoid his obligations by declining to accept his daughters’
choices is not unlimited.  See Restatement § 34 cmt. b (explaining
that problems created by apparently unlimited choice given to one party to a
contract are often avoided by virtue of express or implied limits on that power
of choice, and “[o]ften the choice made must be reasonable in the
circumstances.”).

¶ 32.         Paragraph
4 was part of a marital-settlement agreement involving mutual commitments
concerning asset distribution and support.  The context of the agreement
reflects that the promise was bargained-for, and the agreement contains the
requisite mutuality of obligation.  As the magistrate concluded,

a
reasonable interpretation of the parties’ intent at the time they entered into
the separation agreement would be that father was undertaking an obligation to
contribute some amount towards his daughters’ college educations, but that
father was also reserving some measure of discretion to limit the extent of his
financial obligation based on his ability to pay and all of the other
circumstances existing at the time of the college matriculation.

 

¶ 33.         We
conclude, therefore, that the agreement is not illusory and is not
unenforceably indefinite.  Because we do not rely on father’s past
performance in assessing father’s legal obligation, we do not address father’s
challenge to the superior court’s application of the doctrine of past
performance.

III.  Application of
Reasonableness Requirement

¶ 34.         For
the above reasons, the critical issue in this case is the reasonableness of
father’s refusal to accept his daughters’ college choices.  Father
challenges the magistrate’s conclusion on this point, arguing that Indie’s
tuition should be capped by the tuition at UVM; that he should not be obligated
to pay any tuition costs for Indie’s education at UMSON because Indie
transferred from GMU to UMSON and unreasonably gave up significant grant and
scholarship funds; and that his obligation to pay Francesca’s tuition should be
limited to the costs of a two-year dental-hygiene degree at VTC.  He
further argues that the magistrate erred in crediting scholarships and grants
to the daughters’ non-tuition costs first, rather than applying them to reduce
father’s tuition obligation.

¶ 35.         In
determining whether college expenses are reasonable, courts have considered a
host of factors, including “the financial resources of both parents,
. . . the financial resources of the child, the cost of the school,
the programs offered at the school, the
child’s scholastic aptitude, how the school meets the child’s goals, and the
benefits the child will receive from attending the school. Also relevant
. . . is the extent to which a party unjustifiably may have been
excluded from the college decision-making process.”  Mandel v. Mandel,
906 N.E.2d 1016, 1022 (Mass. Ct. App. 2009) (quotations and alterations
omitted); see also Hathaway, 98 S.W.3d at 680 (noting that the “majority
view” is that court must “determin[e] whether the child’s choice of college is
reasonable,” considering child’s needs, parent’s ability to pay, and cost of
tuition).

¶ 36.         The
magistrate’s findings concerning these factors were supported by the evidence,
and the magistrate’s conclusions were supported by the findings and were within
the magistrate’s discretion.  Father took the position that any tuition
amount above $10,000 per year per daughter is per se unacceptable.  We
recognize that cost is a valid and often compelling consideration, and that in
other circumstances approval might reasonably be withheld on this basis. 
See, e.g., Mazurek, 96 A.3d at 375-82 (crediting evidence on costliness
of institution, among other factors, in determining that father reasonably
withheld approval); Hathaway, 98 S.W.3d at 680 (noting that because
college-tuition provision is subject to implied condition of reasonableness,
parent is not obligated to pay for child to “attend any college, regardless of
cost” (quotation omitted)).  However, under the circumstances of this
case, the magistrate did not abuse her discretion in concluding that father’s
$10,000 cap is unreasonable.  The evidence supported the magistrate’s
findings that father has quite substantial income, in the range of $350,000 to
$400,000 per year.  He incurred annual losses from his thoroughbred-horse
farm of $35,000 to $40,000, and paid more in monthly veterinary bills for the
horses than he was willing to pay for each daughter’s college tuition. 
The evidence supported the magistrate’s findings that the daughters are
progressing reasonably in pursuit of degrees that are reasonably necessary for
their chosen careers, and that both daughters are mature young women who have
chosen practical educations that will enable them to be employed immediately
upon graduation.  The evidence also showed that $10,000—father’s suggested
cap on his obligation—would not be sufficient to pay even in-state tuition at
UVM, which was $12,888 for the 2011-12 year.

¶ 37.         In
connection with this reasonableness analysis, we reject father’s arguments that
his obligations should be reduced because daughters could have made
less-expensive choices.  First, we note that the magistrate did adjust the
amount owed by father so that for Indie’s junior year at UMSON father is
obligated to pay only the tuition that Indie would have incurred had she
remained at GMU.  More importantly, the magistrate’s conclusion that the
daughters’ college choices, and by extension the costs associated with them,
were reasonable, given their reasonable educational and career aspirations and
father’s very substantial resources, was not an abuse of discretion.

¶ 38.         Father’s
arguments on these points are similar to the claims raised in the Pennsylvania
case of Pharoah v. Lapes, 571 A.2d 1070
(Pa. Super. Ct. 1990).  In Pharoah, the settlement agreement
provided that the parties would contribute to their children’s college
educations commensurate with their ability to pay.  The parties’ son (a
class valedictorian) was admitted to the Massachusetts Institute of Technology
(with a small scholarship) and the Georgia Institute of Technology (with a
full-tuition scholarship).  He chose to attend MIT.  The father
objected to paying the additional costs of tuition at MIT because Georgia Tech
had offered the son a tuition-free education.  Id. at 1072 &
n.2.  The Pennsylvania Superior Court found no abuse of discretion in the
trial court’s order obligating appellant to pay the additional costs of tuition
at MIT, because the son “had testified to his educational accomplishments and
aspirations and the reasons behind his decision to attend” MIT, and “gave a
detailed accounting and explanation of his living expenses.”  Id.
at 1072-75; see also Spitzer v. Tucker, 591 A.2d 723, 724-25 (Pa. Super.
Ct. 1991) (affirming trial court’s order requiring father to pay child’s
tuition at Syracuse University even though child could have attended Penn State). 
As in these Pennsylvania cases, we conclude that the evidence of the
reasonableness of the daughters’ choices under the circumstances supports the
magistrate’s conclusions in this case.

¶ 39.         We
likewise reject father’s argument that the magistrate erred in deciding to
credit scholarship and grant funds received by the daughters toward their
non-tuition costs before applying any excess to tuition, reducing the amount
payable by father.  Father argues that this decision “is wholly unsupported
by the express language of the agreement.”

¶ 40.         The
agreement is silent on the application of scholarship and grant funds. 
Courts have varied in their approach to allocating grant and scholarship
funds in the absence of express guidance in the agreement and order.  Some
have held that scholarship or grant funds should be applied to reduce the
parents’ obligation, even if such funds would have otherwise gone to pay
non-tuition costs of attendance incurred by the student.  A leading case
is Norrell v. Norrell, 225 S.E.2d 305 (Ga. 1976).  There, a
provision required the father to “pay tuition” for his son, but the son
received a significant scholarship.  Id.
at 305-06.  The Georgia Supreme Court held that the scholarship
should be credited against the father’s obligation, so he was responsible only
for the “net tuition,” notwithstanding the fact that the son had non-tuition
costs of attendance to which the scholarship may have applied.  Id.[6]

¶ 41.         Other
courts, however, have applied scholarship and
grant funds to non-tuition expenses first.  See Weber v. Weber,
1998 WL 78669, *6 (Ohio Ct. App. Feb. 11, 1998) (noting that court will
“subtract the amount by which any grant or scholarship amount exceeds
non-tuition expenses,” and that such a “formula will allow [father] to benefit
from . . . any amount of financial aid in excess of his
remaining tuition liability”).  In favor of this interpretation is the
“public policy strongly favor[ing] parental contributions to a child’s
education,” which necessarily “militates against any reading of this
stipulation which would obviate the agreed-upon parental obligation and
transfer costs unnecessarily to the student.”  S.B. v. J.R., 977
N.Y.S.2d 591, 597 (Sup. Ct. 2013).

¶ 42.         Pennsylvania
courts have not addressed the question, and the agreement itself does not
provide any guidance.  Moreover, the record lacks extrinsic evidence that
clarifies the parties’ intentions in entering into the agreement.  In the
absence of such information, we conclude that the daughters should receive the
benefit of grants and scholarships which they earned before the excess of those
funds is applied as a credit to father’s obligation.

Affirmed.


 
 
   
 
 
  
 
 
 FOR THE COURT:
 
 
 
 
  
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
 Associate
 Justice
 
 


 














[1]  In the trial court, the parties
litigated whether the college-tuition provision was a matter of child support
subject to jurisdiction in Vermont under the Uniform Interstate Family Support
Act.  15B V.S.A. §§ 101-904.  On appeal, father does not
challenge this Court’s jurisdiction over this matter.





[2]
 Some of the magistrate’s specific findings concerning the cost of
tuition, or the amount of loans or scholarships, vary from the findings in the
December 2012 order.  We rely on the findings from this latter hearing
that was focused more specifically on these issues.  These findings formed
the basis for the magistrate’s ultimate calculations and judgment.





[3]
 On appeal, both parties apply Pennsylvania law.  See Cavallari v.
Martin, 169 Vt. 210, 218, 732 A.2d 739, 745 (1999) (“[I]n interpreting a child support order . . . a
court shall apply the law of the State of the court that issued the order.”) (quoting
28 U.S.C. § 1738B(h)(2)).





[4] 
The Pennsylvania Supreme Court has not addressed the issue.  In the
absence of guidance from the state supreme court on this point, the decisions
of Pennsylvania’s statewide appellate court are the best indication of
Pennsylvania law. Cf. Hicks v. Feiock, 485 U.S. 624, 629-30 & 630
n.3 (1988) (stating, in federal habeas case involving parent held in contempt
of child-support order, that “[w]here an intermediate appellate state court”
makes a “considered judgment upon the rule of law which it announces, that is a
datum for ascertaining state law which is not to be disregarded by a federal
court unless [the federal court] is convinced by other persuasive data that the
highest court of the state would decide otherwise” (quoting West v. AT&T
Co., 311 U.S. 223, 237-38 (1940)).





[5]
 Because we conclude that this agreement is properly construed to include
such a requirement, we express no opinion on the enforceability under
Pennsylvania law of an agreement that does not include such a term.





[6]
 Several courts have followed this approach.  See, e.g., Marriage
of Gowdy, 816 N.E.2d 372, 374-76 (Ill. Ct. App. 2004) (interpreting
provision directing that parents would each pay 10% and daughter would pay 80%
of all college expenses to allow parents to receive an offset for “any
scholarships or grants that [daughter] actually received,” even though this
would have the effect of raising costs to daughter); Best v. Best, 470
N.E.2d 84, 87 (Ind. Ct. App. 1984) (adopting Norrell rule that
“tuition,” unless otherwise defined, “means tuition fees less financial aid or
scholarships received by the student”).